**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

ELI LILLY AND COMPANY,

               Plaintiff,

       v.

APOTEX INC.,

               Defendant.

C.A. No. 1:17-cv-2865-TWP-MPB

**REDACTED PUBLIC VERSION**

**BRIEF IN SUPPORT OF APOTEX'S CROSS-MOTION
<u>FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

APPENDIX .................................................................................................................. vi

INTRODUCTION ......................................................................................................... 1

STATEMENT OF MATERIAL FACTS ........................................................................ 3

    I.     Prior Art. ........................................................................................... 3

          A.    Pemetrexed Studies. ............................................................ 4

    II.    Prosecution History. ........................................................................ 7

          A.    The November 2002 Amendment. .................................... 8

          B.    The January 2005 Amendments. ...................................... 11

          C.    The November 2005 Amendments. ................................. 12

          D.    The July 2007 Amendments. ........................................... 13

LEGAL STANDARDS .................................................................................................. 15

    III.   Literal Infringement. ....................................................................... 15

          A.    "Properly Construed Claims." .......................................... 15

    IV.   Equivalent Infringement. ................................................................ 15

          A.    "The Governing Framework." .......................................... 17

               1.    Rebuttal of the *Festo* Presumption. .............................. 18

                    a.    "Unforeseeable." ........................................... 19

                    b.    The "Tangential" Criterion. ........................... 19

                    c.    "Some Other Reason." .................................... 20

                2.    Surrender of the Accused Equivalent. ........................... 20

    V.    The Scope of the Original Claims. ................................................... 21

ARGUMENT ................................................................................................................. 22

    VI.   The January 2005 Amendments. ..................................................... 22

               1.    The "Antifolate" Claims. .............................................. 22

               2.    The "ALIMTA" Claims. ............................................... 22

                3.    The Specification. ......................................................... 23

                    a.    Lilly's Most Preferred Example. ..................... 24

               4.    The Literature. .............................................................. 25

B. A Substantial Reason Relating to Patentability. ........................................... 26

    1. Lilly's Argument ................................................................... 26

C. The *Festo* Presumption ███████████████████████
███████. ........................................................................... 26

    1. Lilly Cannot Overcome the *Festo VIII* Presumption. ................... 27

        a. ████████████████████████
. ................................................................ 27

        b. ██████████████████████████ ............. 27

        c. No "Other Reason." ..................................................... 30

D. ██████████████████████. ............................................ 30

VII. The November 2005 Amendments. .................................................................. 30

A. Lilly Amended the June 2001 "Tumor Growth" Claims. ......................... 30

    1. The "Antifolate" Claims. ..................................................... 30

    2. The "ALIMTA" Claims. ....................................................... 31

B. Substantial Reasons Related to Patentability. ........................................... 31

C. The *Festo VIII* Presumption. .................................................................. 31

D. █████████████████████. .............................................. 31

VIII. The July 2007 Amendments. ........................................................................... 32

A. Lilly Narrowed the June 2001 "Method of Administering" Claims. ......... 32

    1. The "Antifolate" Claims. ..................................................... 32

    2. The "ALIMTA" Claims. ....................................................... 32

B. Substantial Reasons Related to Patentability. ........................................... 32

C. The *Festo VIII* Presumption. .................................................................. 33

D. █████████████████████. .............................................. 33

IX. Lilly's Statement. ............................................................................................ 33

X. Lilly's Additional Arguments. ......................................................................... 34

A. "ALIMTA[®]." ........................................................................................ 34

B. "Alimta®." ............................................................................................. 34

C. "Threw Up His Hands." .......................................................................... 35

CONCLUSION ........................................................................................................ 35

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Bayer AG v. Elan Pharm. Research Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000) ....................................................................... 20, 21

*Biovail Corp. Int'l v. Andrx Pharm., Inc.*,
   239 F. 3d 1297 (Fed. Cir. 2001) .......................................................................... 15

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006) ........................................................................... 20

*Eli Lilly & Co. v. Hospira, Inc.*,
   No. 2018-2126, 2019 WL 3756065 (Fed. Cir. Aug. 9, 2019) ................................. 2, 15, 16, 22

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
   No. 10-cv-1376-TWP-DKL, 2012 WL 2358102 (S.D. Ind. June 20, 2012) ..................... 15, 24

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
   149 F.3d 1309 (Fed. Cir. 1998) ........................................................................... 16

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   234 F.3d 558 (Fed. Cir. 2000) ........................................................................ passim

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   344 F.3d 1359 (Fed. Cir. 2003) ....................................................................... passim

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)................................................................................. 16, 17, 18

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
   339 U.S. 605 (1950)........................................................................................ 16

*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*,
   467 U.S. 51 (1984)......................................................................................... 17

*In re Am. Academy of Sci. Tech Ctr.*,
   367 F.3d 1359 (Fed. Cir. 2004) ....................................................................... 21, 23

*In re Bass*,
   314 F.3d 575 (Fed. Cir. 2002) ............................................................................ 21

*In re Bond*,
   910 F.2d 831 (Fed. Cir. 1990) ............................................................................ 21

*In re Cortright*,
   165 F.3d 1353 (Fed. Cir. 1999) ........................................................................... 21

*In re Prater*,
    415 F.2d 1393 (C.C.P.A. 1969) ......................................................................... 22, 23

*In re Walter*,
    698 F. App'x 1022 (Fed. Cir. 2017) ........................................................................ 21

*In re Yamamoto*,
    740 F.2d 1569 (Fed. Cir. 1984) ............................................................................... 21

*In re Zletz*,
    893 F.2d 319 (Fed. Cir. 1989) ......................................................................... 21, 23

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
    285 F.3d 1046 (Fed. Cir. 2002) .............................................................................. 16

*Kinzenbaw v. Deere & Co.*,
    741 F.2d 383 (Fed. Cir. 1984) ................................................................................ 20

*Kraft Foods, Inc. v. Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000) ........................................................................ 15, 16

*Lemelson v. Gen. Mills, Inc.*,
    968 F.2d 1202 (Fed. Cir. 1992) .............................................................................. 20

*London v. Carson Pirie Scott & Co.*,
    946 F.2d 1534 (Fed. Cir. 1991) .............................................................................. 16

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) .......................................................................................... 15, 21

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) .................................................................................. 15

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ................................................................................................ 29

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .............................................................................. 24

*Pioneer Magnetics, Inc. v. Micro Linear Corp.*,
    330 F.3d 1352 (Fed. Cir. 2003) ...................................................................... passim

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018) ................................................................................ 20

*Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*,
    517 F.3d 1364 (Fed. Cir. 2008) .............................................................................. 16

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*,
    172 F.3d 836 (Fed. Cir. 1999) ................................................................. 15

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ............................................................... 29

*V-Formation, Inc. v. Benetton Grp. SpA*,
    401 F.3d 1307 (Fed. Cir. 2005) ............................................................... 15

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ................................................................................... 16

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,
    904 F.2d 677 (Fed. Cir. 1990) ................................................................. 16

## Federal Statutes

35 U.S.C. § 112 ................................................................................... 10, 28

## Other Authorities

MPEP § 2173.05(u) .............................................................................. 10, 29

## **APPENDIX**

*See* Exhibit 1 hereto.

## <u>INTRODUCTION</u>

Eight months ago, Lilly interpreted its patent to literally ***include*** ██████████████ ██████████████. Now, in response to overwhelming evidence of prosecution history estoppel, Lilly interprets its patent to literally ***exclude*** ████████████████████████.

***January 8, 2019***. Lilly proposed that the Court interpret "pemetrexed disodium" to mean "pemetrexed and two sodiums." According to those interpretations, the administration of pemetrexed disodium claim phrases would literally ***include*** ████████████████ ██████████████. In fact, in its proposed claim construction findings, Lilly emphasized that its litigation expert, Dr. Chabner, interpreted "pemetrexed disodium" broadly to mean a "molar ratio" of "one pemetrexed, two sodiums":



The "molar ratio" refers to the relative concentration of sodium ions to pemetrexed ions. ECF 88-3 at 88:15–22 (Q: What is the molar ratio as I have used it? A: It's the ratio of one element to another. Q: Where in the '209 patent did you understand there to be a reference to molar ratio? A: Did I understand that in the '209 patent? Well, it's talking about pemetrexed disodium, so it's one pemetrexed, two sodiums. Seems to me that's a 2:1 ratio.).

ECF 162 ¶ 27; *see also id.* ¶¶ 18, 26, 28, 29, 34, 63, 65, 66-69.

***July 30, 2019***. Lilly abandoned those "molar ratio" interpretations, proposing instead that the Court interpret "pemetrexed disodium" to mean "the generic name for the substance" pemetrexed disodium. ECF 232 at 25. Why? Because, to avoid prosecution history estoppel, Lilly must argue that "pemetrexed disodium" is "synonymous" with "(ALIMTA)" which is "interchangeable" with the "ALIMTA" patent application claim term that triggers the estoppel. And, now, according to Lilly, those words refer to the "same substance"—pemetrexed disodium. *See id.* at 2. But not just any "substance." According to Lilly, "pemetrexed disodium" should be

interpreted as limited to a single example in the specification, described as "most preferred, Pemetrexed Disodium (ALIMTA), as manufactured by Eli Lilly and Company." *See id.* Thus, the evidence has compelled Lilly to interpret its patent as limited to its narrowest readings of the most preferred embodiment, literally ***excluding*** ███████████████████████████.

Ten days after Lilly changed its interpretation, the Federal Circuit construed "pemetrexed disodium" to mean "the pemetrexed disodium salt." *Eli Lilly & Co. v. Hospira, Inc.*, No. 2018-2126, 2019 WL 3756065, at *5 (Fed. Cir. Aug. 9, 2019). In light of that decision, and consistent with the additional binding precedent cited below, Apotex respectfully submits that the objective evidence in this Apotex Case proves that prosecution history estoppel bars Lilly from asserting infringement under the doctrine of equivalents, as follows:

• There is no genuine dispute that the word "ALIMTA" was associated with "pemetrexed" and "pemetrexed disodium" in the literature, and that "ALIMTA" was used to mean "pemetrexed" in the relevant contexts, including in the context of methods of administration and Lilly's NDA product labels. *See, e.g.*, ¶¶ 12, 17, 21, 24, 25, 31, 38 below.

• A person of ordinary skill in the art would understand that the method of administration uses of "ALIMTA" in the specification refer to pemetrexed, particularly where the dose of pemetrexed is specified. *See, e.g.*, ¶¶ 2-12, 15, 16, 21, 24, 38 below. Thus, the broadest reasonable interpretation of the claim term "ALIMTA" is "pemetrexed." *See* pages 22-25 below.

• Each time Lilly amended its method claims from "wherein the antifolate is ALIMTA" to "pemetrexed disodium," ██████████████████████████. Moreover, a competitor would reasonably conclude that each of Lilly's "ALIMTA" amendments ████████████ ██████████████████ that Lilly specifically described and disclosed by March 2001. *See, e.g.*, ¶¶ 28, 34, 42 & pages 30-33 below; SJ221█████████████████████.

## STATEMENT OF MATERIAL FACTS

There should be no genuine dispute regarding the following facts detailing the prosecution history of the 209 patent:

### I.   Prior Art.

1.     The 209 patent describes prior art use of "antifolates."   *See, e.g.*, SJ944 at col. 1:11 to col. 2:54.

2.     The 209 patent describes an "antifolate" as the enzyme inhibitor:

> The terms "antifolate" and "antifolate drug" refer to a chemical compound which inhibits at least one key folate-requiring enzyme of the thymidine or purine biosynthetic pathways, preferably thymidylate synthase ("TS"), dihydro-folate reductase ("DHFR"), or glycinamide ribonucleotide formyltransferase ("GARFT"), by competing with reduced folates for binding sites of these enzymes.

SJ945 at col. 4:28; *see also* SJ944 at col. 1:12, 18, 19, 36 ("Antifolates inhibit one or several key folate-requiring enzymes . . . ."), 43, 63, 65 & col. 2:2, 27 ("cytotoxic activity of GARFT inhibitors and antifolates as a class remains a serious concern in the development of antifolates as pharmaceutical drugs"); SJ946 at col. 6:57 to col. 8:54 (describing "antitumor efficacy of an antifolate," "antitumor activity and toxic effects of the antifolates themselves," "[a]ntitumor activity" and "toxicity of the antifolate").

3.     The 209 patent describes Lilly's precursor to pemetrexed, an antifolate known as "lometrexol." *See, e.g.*, SJ944 at col. 1:41 (SJ58-63); col. 2:3 (SJ29: "LY231514 . . . (Fig. 2e) serendipitously arose from a chemical programme . . . synthesising analogues of DDATHF (Lometrexol), an inhibitor of [GARFT]."); SJ47-56; SJ99 (FIG. 2), SJ101 (Table 2), SJ102 (comparing "[i]n vitro polyglutamation of . . . Lometrexol and LY231514" and describing "inhibitory activity of LY231514"); *see also* SJ83; SJ117 (Fig. 1).

4.     The 209 patent directs the reader to the Lilly 974 patent, which describes a "treatment for toxicities" related to the "use of GARFT inhibitors," including lometrexol and "related antifolates" such as pemetrexed.  *See, e.g.*, SJ948 at col. 10:20 ("administered ALIMTA . . . as described in" the Lilly 974 patent); SJ7 at col. 2:34; SJ11 at col. 9 (claims 8 & 10), col. 10 (claims 16 & 17); *see also* SJ471-72 (representing to FDA that the 974 patent claims a method of use of "ALIMTA"); SJ686-87, 692 (representing to competitors that the Lilly 974 patent claims a method for reducing toxicity of "ALIMTA").

5.     The Lilly 974 patent broadly claimed methods for reducing the toxicity of a GARFT "inhibitor" or "other antifolate," and specifically claimed "lometrexol."  *See, e.g.*, SJ11 at col. 9 (claims 8 & 10), col. 10 (claims 16, 17 & 19).  Although the Lilly 974 patent describes and diagrams the "diacid" form of lometrexol, a person of ordinary skill in the art understands that the claimed method "wherein the [GARFT] inhibitor is lometrexol" refers to the active moiety, lometrexol dianion—*i.e.*, the "antifolate" that inhibits GARFT.  SJ7 at col. 1:18 & col. 2:66 to col. 3:22; SJ2451 (41:8-43:16).

**A.     Pemetrexed Studies.**

6.     Initially, pemetrexed was described by a chemical name and structural diagram, and was called "compound 15."  *See, e.g.*, SJ1-5.  The dose of pemetrexed administered to mice was reported as "mg/kg": "Compound 15 is also very effective . . . ; good growth inhibition . . . was observed when mice were treated at 25 mg/kg and 50 mg/kg . . . ."  SJ4.

7.     By 1994, "[p]harmaceutically acceptable salts" of pemetrexed, including ████████████████████████████████, had been described and claimed.  *See, e.g.*, SJ14 at col. 2:40; SJ23 at col. 19:47 & col. 20 (claims 1 & 3).

8.     By 1995, pemetrexed also was referred to by its Lilly compound code, "LY231514."  *See, e.g.*, SJ27 (Fig. 2); SJ37 (Fig. 1).  The dose of pemetrexed administered to

animals was reported as "mg/kg," and to humans as "mg/m$^2$." *See, e.g.*, SJ30; SJ37.  And the dose of LY231514 was correlated to plasma concentration of pemetrexed.  SJ40-42 (Fig. 2, Fig. 3 ("LY231514 Dose, mg/m$^2$"), Figs. 4 & 5 ("These data suggest . . . LY231514 is primarily eliminated renally.")).

9.     By 1997, pemetrexed also was referred to as "multitargeted antifolate." *See, e.g.*, SJ58, 60 ("LY231514, A Multitargeted Antifolate * * * We now report that LY231514 and its polyglutamates also markedly inhibit other key folate-requiring enzymes, including [DHFR and GARFT]. * * * [O]ur data suggest that LY231514 is a novel classical antifolate. * * * The parent monoglutamate LY231514 . . . ."); SJ75 ("LY231514, a multitargeted antifolate, is a classical antifolate . . . . * * * LY231514 was administered IV at doses of 500 to 600 mg/m$^2$ . . . .").

10.     By 1998, pemetrexed also was referred to as "MTA."  SJ83-84 ("MTA (LY231514), a multi-targeted antifolate, is a classical antifolate undergoing intracellular polyglutamation. * * * MTA (parent compound)").  The dose of pemetrexed administered to humans was reported as "MTA (600 mg m$^{-2}$)."  SJ86; *see also* SJ92 ("LY231514 (MTA) is a new generation multitargeted antifolate antimetabolite with inhibitory activity . . . .  Of a total of 246 patients . . . treated with MTA (600 mg/m$^2$ . . . .")).  Similarly, the dose of pemetrexed administered to mice was reported as "mg/kg" of LY231514.  *See, e.g.*, SJ111, 114 ("LY231514 produced >95% inhibition of tumor growth at 30 to 300 mg/kg, but all mice died at 800 mg/kg. * * * [S]everal lines of evidence suggest that multiple enzyme-inhibitory mechanisms are involved in cytotoxicity, hence the acronym MTA (multitargeted antifolate) . . . . * * * [I]ntracellular concentrations of LY231514 and its polyglutamates . . . . * * * LY231514 (mg/kg per day) * * * [I]ntracellular transport of LY231514.").

11.   By 1999, "MTA" was depicted as both pemetrexed dianion (*i.e.*, the parent monoglutamate) and pemetrexed diacid:



SJ137-38; SJ2439 (Dr. Chabner: "the POSA would consider both of these compounds to be 'pemetrexed'"); *see also* SJ118, 123, 126, 129 (describing "[i]nhibitory [a]ctivity of MTA," referring to "parent monoglutamate MTA" and "[a]ntitumor activity of MTA (LY231514 . . . )," and reporting the "dose" of "MTA" in animal studies as "mg/kg," including "100" and "150 mg/kg MTA," and in human studies as "mg/m$^2$," including "500 mg/m$^2$" and "600 mg/m$^2$").

12.   By 2000, a publication associated both pemetrexed disodium and pemetrexed with "ALIMTA":



SJ167.  Citing *Taylor* (1992) and *Shih* (1997), the author used "MTA" to refer to pemetrexed,

6

and reported dosing in humans as "mg/m$^2$" and "mg/mL", including as "MTA 600 mg/m$^2$."  *Id.* (citing SJ1, SJ58); *see also* SJ154 (reporting dose as "LY231514 600 mg/m$^2$").  A second publication associated "ALIMTA" with pemetrexed.  SJ196 ("LY231514 . . . (ALIMTA, Pemetrexed, MTA, (multitargeted antifolate))").  And a third publication used "ALIMTA" to mean pemetrexed.  SJ174 ("ALIMTA . . . can be polyglutamated"); *see also* SJ137 (depicting formation of pemetrexed polyglutamates).

## II.   Prosecution History.

13.   In June 2000, Lilly filed the earliest application leading to the 209 patent.  SJ180. The application described studies of pemetrexed in mice and humans; broadly claimed methods of using "an antifolate," and specifically claimed the antifolate "ALIMTA":

> 4.   A method of administering an ==antifolate== to a mammal in need thereof, comprising administering an effective amount of said antifolate in combination with a methylmalonic acid lowering agent and folic acid.
>
> 5.   A method of reducing the toxicity of an ==antifolate== in mammals comprising administering to said mammals an effective amount of said antifolate in combination with a methylmalonic acid lowering agent and folic acid.

> 9.   A method of any one of claims 1-8 wherein ==the antifolate is ALIMTA.==

SJ193.

14.   In April 2001, Lilly filed another application in the chain leading to the 209 patent.  SJ261.  Again, Lilly broadly claimed methods of using "an antifolate," and specifically claimed "wherein the antifolate is ALIMTA."  SJ278-79 (claims 4, 5 & 9).

15.   By May 2001, a publication referred to pemetrexed as "pemetrexed," depicted its chemical structure, reported its "[i]nhibitory activity," and reported the dose of pemetrexed in

"mg/kg" and "mg/m$^2$," including "pemetrexed 500 mg/m$^2$" and "pemetrexed 600 mg/m$^2$." SJ281-83, 286.

16.     In June 2001, Lilly filed the PCT application leading to the 209 patent.  SJ292. Again, Lilly broadly claimed use of "an antifolate," and specifically claimed "wherein the antifolate is ALIMTA."   SJ309-11 (claims 4, 5, 9, 12, 15, 19, 20 & 23).   The application described administration of pemetrexed to mice, and reported dosing as "ALIMTA (100 mg/kg or 150 mg/kg)"; "ALIMTA (100 mg/kg)"; "ALIMTA (150 mg/kg)"; "ALIMTA doses of 100 mg/kg and 150 mg/kg."   SJ302-03.   The application also described administration of an "antifolate" to patients "at a dose of 5 mg/m$^2$/dose," including a "[m]ethod of administration and dosing procedures" for "ALIMTA."   SJ304-05; SJ306 ("first dose of MTA * * * first dose of ALIMTA"); SJ307 ("patients administered ALIMTA . . . as described" in the Lilly 974 patent).

17.     By May 2002, publications associated pemetrexed, "Alimta" and "ALIMTA." *See, e.g.*, SJ317 ("Multitargeted Antifolate Pemetrexed (Alimta) * * * Pemetrexed (Alimta, LY231514)"); SJ324 ("pemetrexed (Alimta, LY231514)"); SJ334 ("Pemetrexed (Alimta, LY231514; Eli Lilly and Co, Indianapolis, IN) was developed because it inhibits at least three key enzymes . . . ."); SJ342 ("pemetrexed (ALIMTA, LY231514)").

### A.     The November 2002 Amendments.

18.     In November 2002, Lilly amended its June 2001 claims, maintaining broad claims to "an antifolate" and specific claims to "wherein the antifolate is ALIMTA."  SJ351.

19.     In March 2004, in response to a restriction requirement, Lilly selected its "method of reducing the toxicity" claims and maintained its broad claims to "administering an antifolate" and specific claims to "ALIMTA."  SJ513; SJ529 (claims 9, 29, 30 & 33: "wherein the antifolate is ALIMTA").

20.     In September 2004, the USPTO rejected the "wherein the antifolate is ALIMTA" claims as vague and indefinite, as follows:

**Vague and Indefinite** Language Rejections
35 U.S.C. 112, 2nd

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 9, 29, 30, and 33 (as depending from claim 9) are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. The instant claims refer to the trade name "ALIMTA." It is improper claim language to use a trademark or trade name in a claim to identify or describe a material or product. This not only renders a claim indefinite, but also constitutes an improper use of the trademark or trade name (MPEP § 2173.05 (u)).

SJ678; *see also* SJ313; SJ314; SJ539; SJ557; SJ559.

21.     In additional rejections based on obviousness, the Examiner associated the words "multitargeted antifolate," "pemetrexed disodium," "LY231514" and "ALIMTA":

John et al. teach the toxicities associated with administration of the mutitargeted antifolate pemetrexed disodium, LY231514 (also known by the trade name ALIMTA).

Worzolla et al. teach a method of reducing the toxicity and enhancing the antitumor activity of LY231514 (ALIMTA) in mice with folic acid supplementation (p. 3267 and Fig. 2).

SJ679-80.  As noted above, "LY231514" is the Lilly compound code for pemetrexed.  *See, e.g.*, ¶ 8 above; SJ113-14 (*Worzalla* (1998): Table II & Fig. 2 (providing "LY231514 antitumor

activity" based on "(mg/kg)" dosing in mice)); *see also* A240 ¶ 77 n.71 (Dr. Pinal: "LY231514 is the Lilly compound number for pemetrexed").[1]

22.     There is no dispute that the 209 patent does not define the word "ALIMTA"—*i.e.*, it is vague and indefinite.  *See* ¶ 16 above; SJ941-50; 35 U.S.C. § 112; *see also* ECF 193 at 5-8.

23.     In addition, by rejecting Lilly's "wherein the antifolate is ALIMTA" claims according to MPEP § 2173.05(u), the Examiner concluded that use of "ALIMTA" in the literature also was vague and indefinite—*e.g.*, its meaning was not "well-known and satisfactorily defined in the literature."  *See* SJ678; SJ313; SJ314; SJ539; SJ557; SJ559.

24.     The literature shows that at least one publication associated "ALIMTA" with both pemetrexed disodium and pemetrexed.  SJ167.  A second publication associated "ALIMTA" with just pemetrexed.  SJ196; *see also* SJ533-34; SJ566.  And additional literature proves that persons of ordinary skill in the art understood "ALIMTA" to mean pemetrexed.  *See, e.g.*, SJ174; SJ394-400; SJ601-06; SJ722-23; SJ952-56.  For example, Dr. Adjei understood "ALIMTA" to mean pemetrexed diacid, as described in *Taylor* (1992), and pemetrexed dianion, as described in *Calvert* (1999).  SJ394 (citing SJ1, SJ135).  And Dr. Schultz—citing *Shih* (1997), *Worzalla* (1998) and *Schultz* (1999)—used "ALIMTA" and "Alimta" to mean pemetrexed, and reported the dose of "Alimta" in humans at "500 mg/m$^2$" and in mice at "100 mg/kg/dose."  SJ723 (citing SJ58), SJ731, SJ735 (citing SJ111, SJ148).

25.     Consistent with that literature, Lilly associated "ALIMTA" with pemetrexed in its communications with FDA.  For example:

---

[1] "A###" refers to the Lilly Appendix (ECF 232-1).

| | |
|---|---|
| **Drug:** | **ALIMTA** |
| **Generic name:** | **Pemetrexed**; N-[4-[2-(2-amino-3,4-dihydro-4-oxo-7H-pyrrolol[2,3-d]pyrimidin-5-yl)ethyl]-benzoyl]-L-glutamic acid; **MTA**; **LY231514**; |
| **Formulation:** | 40 ml aqueous solution of 200 or 1000 mg for intravenous infusion; lyophilized powder of 20, 100 and 500 mg for reconstitution and intravenous infusion. |

SJ1624.  And Lilly used both "Alimta" and "ALIMTA" to mean pemetrexed.  *See, e.g.*, SJ2194 ("Alimta itself is the active moiety."); SJ511 ("Each vial contains 500 mg of ALIMTA. * * * Reconstitute 500-mg vials . . . to give a solution containing 25 mg/mL ALIMTA.").

**B.**      **The January 2005 Amendments.**

26.      In response to the September 2004 rejections, Lilly amended its "antifolate" claims and canceled its "ALIMTA" claims.  SJ707, 710-11.  Although Lilly explained its reason for the amendment from "antifolate" to "pemetrexed disodium," Lilly simply canceled the "ALIMTA" claims "without prejudice."   SJ711 (canceling claims 9, 29, 30 & 33), SJ712 ("Please delete Claims 8, 9, 29-30, and 32-33 without prejudice."), SJ713 ("deletion of these Claims render this objection moot"); SJ713-17 (explaining reason for amendment from "antifolate" to "pemetrexed disodium").

27.      The January 2005 Amendment does not state any reason why Lilly canceled its "wherein the antifolate is ALIMTA" claims.  SJ713-17.

28.      Lilly has not shown that, as of January 2005, Lilly could not reasonably be expected to amend its "ALIMTA" claims to ███████████████████████████  *See, e.g.*, SJ10 (claiming a method of using pemetrexed and its pharmaceutically acceptable salts); SJ496-97 (claiming a composition containing ███████████████████████); SJ221 (███████████████████); SJ359, SJ519, SJ525, SJ695  (amending

corresponding European application claims from "wherein the antifolate is ALIMTA" to "pemetrexed," and stating that the claims have been "refocused on the use of the antifolate compound pemetrexed"); SJ693 ("PEMETREXED DISODIUM"); SJ694 ("PEMETREXED").

29.     In September 2005, the USPTO issued a notice of allowability of several "method of reducing toxicity" claims that ultimately issued as the Lilly 065 patent.  SJ756; SJ805.

**C.     The November 2005 Amendments.**

30.     In November 2005, Lilly filed a new patent application and amended its "antifolate" and "wherein the antifolate is ALIMTA" claims.  For example, Lilly amended its original claim to a "method of inhibiting tumor growth" as follows:

> 3.     (Currently Amended)  A method of inhibiting tumor growth in ~~mammals~~ humans comprising administering to said ~~mammals~~ human an effective amount of ~~an antifolate~~ pemetrexed disodium in combination with a methylmalonic acid lowering agent selected from the group consisting of vitamin B$_{12}$, hydroxocobalamin, cyano-10-chlorocobalamin, aquocobalamin perchlorate, aquo-10-chlorocobalamin perchlorate, azidocobalamin, chlorocobalamin, cobalamin, and cyanocobalamin wherein the methylmalonic acid lowering agent is administered prior to the first administration of pemetrexed and the methylmalonic acid lowering agent administration is repeated from about every 6 weeks to about every 12 weeks.

SJ765.

31.     In February 2007, the Examiner obtained search results including the terms "pemetrexed disodium" and "pemetrexed."   SJ814; SJ838.  In rejecting the November 2005 claims, the Examiner: (a) reproduced claim 3 above; (b) stated that Lilly "may wish to insert the word --disodium--, after the word 'pemetrexed'"; and (c) explicitly distinguished pemetrexed from pemetrexed disodium:

> Taylor teaches N-(pyrrolo(2,3-D)pyrimidin-3-ylacyl)-glutamic acid derivatives which includes LY 231514 (pemetrexe) and LY 231514-disodium (pemetrexed disodium) are effective as antineoplastic agents to inhibit the growth of tumors (See column 8, lines 57-63).  Note particularly column 8, lines 64-68 states that other antineoplastic agents can be combined with LY 231514.  Note particularly column 9, line 1 shows the various modes of administration such as parenteral routes (intramuscular) and oral.

SJ866-67.

32.     In August 2007, the Examiner telephoned Lilly to inquire whether Lilly intended to respond to the February 2007 rejections.  SJ877.  Lilly stated only that a "response will not be filed," and the November 2005 claims were abandoned.  *Id.*; SJ878.

33.     The November 2005 Amendment does not state any reason why Lilly amended its "antifolate" and "ALIMTA" claims to include "pemetrexed" and "pemetrexed disodium." SJ763-67.

34.     Lilly has not shown that, as of November 2005, Lilly could not reasonably be expected to amend its "antifolate" and "ALIMTA" claims to ████████████████  ████████     *See* ¶ 28 above (citing SJ10, SJ496-97, SJ221, SJ359, SJ519, SJ525 & SJ695). For example, Lilly's amended claims included the claim term "pemetrexed."  ¶ 30 above; SJ693 ("PEMETREXED DISODIUM"); SJ694 ("PEMETREXED").

**D.     The July 2007 Amendments.**

35.     In July 2007, Lilly filed a new patent application and amended its "antifolate" and "ALIMTA" claims to "pemetrexed disodium."  SJ292; SJ870, 872-74.

36.     In December 2008, Lilly canceled its July 2007 claims, and again amended its "antifolate" and "wherein the antifolate is ALIMTA" claims to "pemetrexed disodium."  SJ880.

37.     In February 2009, the Examiner: (a) rejected all claims as obvious; (b) distinguished pemetrexed and pemetrexed disodium; and (c) noted that *Worzalla* (1998) "teaches the supplementation of folic acid with LY 231514 to enhance LY 231514 antitumor activity." SJ890.

38.     After further exchanges, Lilly submitted its NDA product label to the USPTO. SJ893; SJ899; SJ906; SJ918. Although the use of "ALIMTA" in the label sometimes is vague, there is no genuine dispute that Lilly's NDA product label includes uses of "ALIMTA" that mean pemetrexed. *See, e.g.*, SJ920-21, 927 ("Dose of ALIMTA (mg/m$^2$) * * * Vials contain either 100 mg or 500 mg of ALIMTA. * * * Reconstitution of either size vial gives a solution containing 25 mg/mL ALIMTA. * * * ALIMTA is primarily eliminated unchanged renally . . . . Concomitant administration . . . could potentially result in delayed clearance of ALIMTA.").

39.     In August 2010, the USPTO issued the 209 patent. SJ941.

40.     The 209 patent prosecution file does not state any reason why Lilly amended its "antifolate" and "ALIMTA" claims to "pemetrexed disodium." *See, e.g.*, SJ870-76, 880-83.

41.     The 209 patent prosecution file contains additional evidence that "ALIMTA" is vague and indefinite, but also confirms that "ALIMTA" was used to mean pemetrexed, consistent with the patent specification. *Compare, e.g.*, ¶¶ 2, 16 & 38.

42.     Lilly has not shown that, as of July 2007, Lilly could not reasonably be expected to amend its "antifolate" and "ALIMTA" claims to ███████████████████ *See* ¶¶ 28, 34 (citing SJ10, SJ496-97, SJ221, SJ359, SJ519, SJ525 & SJ695); SJ693 ("PEMETREXED DISODIUM"); SJ694 ("PEMETREXED").

                               *      *      *

14

## LEGAL STANDARDS

### III.    Literal Infringement.

"Literal infringement requires a patentee to prove by a preponderance of the evidence that every limitation of the asserted claim is literally met by the allegedly infringing device." *Biovail Corp. Int'l v. Andrx Pharm., Inc.*, 239 F. 3d 1297, 1302 (Fed. Cir. 2001). "An infringement analysis entails two steps." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1366 (Fed. Cir. 2000). "The first step is determining the meaning and scope of the patent claims asserted to be infringed." *Id.* "The second step is comparing the properly construed claims to the device accusing of infringing." *Id.* (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996)). If any claim limitation is missing, there is no literal infringement. *See V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005) ("Literal infringement requires that each and every limitation set forth in a claim appear in an accused product."); *Hospira*, 2019 WL 3756065, at *4 (quoting *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999)).

#### A.    "Properly Construed Claims."

The legal standards for claim construction are set forth in Apotex's proposed findings of fact and conclusions of law. *See* ECF 163-1 at 12-18; ECF 198-2 at 12-18. In summary, the "construction of patent claims, which requires determining the meaning and scope of the claims, is a matter of law for the court." *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, No. 10-cv-1376-TWP-DKL, 2012 WL 2358102, at *1 (S.D. Ind. June 20, 2012) (citing *Markman*, 52 F.3d at 970-71); *Hospira*, 2019 WL 3756065, at *4 ("Claim construction is ultimately an issue of law . . . .").

### IV.    Equivalent Infringement.

Equivalent infringement requires a patentee to show that the "claimed limitation" and the "accused component" are not "substantially different." *Kraft*, 203 F.3d at 1371 (quoting *Ethicon*

*Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1321 (Fed. Cir. 1998)).  The Federal Circuit has "emphasized" that the "doctrine of equivalents is 'the exception . . . not the rule,' and not merely 'the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims.'"  *Hospira*, 2019 WL 3756065, at *6 (quoting *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991)).  "Patent infringement is principally determined by examining whether the accused subject matter falls within the scope of the claims."  *Id.*

Courts have "placed important limitations on a patentee's ability to assert infringement under the doctrine of equivalents."  *Hospira*, 2019 WL 3756065, at *6 (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 737-41 (2002) ("*Festo VIII*"); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950); *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc); *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 683 (Fed. Cir. 1990)).  One of these limitations, prosecution history estoppel, "arises when a patent applicant narrows the scope of his claims during prosecution for a reason 'substantial[ly] relating to patentability.'"  *Id.* (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366-67 (Fed. Cir. 2003) (en banc) ("*Festo X*")).  "Whether prosecution history estoppel applies to bar a doctrine of equivalents claim is a question of law" that requires "direct consideration of the specific record" of this Apotex Case.  *Id.* at *6, *8 n.5 (citing *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1371 (Fed. Cir. 2008)).  "This case-specific focus, within the governing framework, comports with the equitable nature of prosecution history estoppel."  *Id.* at *8 n.5 (citing *Festo VIII*, 535 U.S. at 738).  "Estoppel is an equitable doctrine invoked to avoid injustice

in particular cases . . . [and] a hallmark of the doctrine is its flexible application . . . ." *Id.* (quoting *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 59 (1984)).

A.      **"The Governing Framework."**

"The first question in a prosecution history estoppel inquiry is whether an amendment . . . has narrowed the literal scope of a claim." *Festo X*, 344 F.3d at 1366 (citing *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003)). "If the amendment was not narrowing, then prosecution history estoppel does not apply." *Id.* "But if the accused infringer establishes that the amendment was a narrowing one, then the second question is whether the reason for that amendment was a substantial one relating to patentability." *Id.* "When the prosecution history record reveals no reason for the narrowing amendment, *Warner-Jenkinson* presumes that the patentee had a substantial reason relating to patentability." *Id.* at 1366-67. "[C]onsequently, the patentee must show that the reason for the amendment was not one relating to patentability if it is to rebut that presumption." *Id.* at 1367. "[A] patentee's rebuttal of the *Warner-Jenkinson* presumption is restricted to the evidence in the prosecution history record." *Id.* (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 586 & n.6 (Fed. Cir. 2000) ("Festo VI")). "If the patentee successfully establishes that the amendment was not for a reason of patentability, then prosecution history estoppel does not apply." *Id.*

"If, however, the court determines that a narrowing amendment has been made for a substantial reason relating to patentability—whether based on a reason reflected in the prosecution history record or on the patentee's failure to overcome the *Warner-Jenkinson* presumption—then the third question in a prosecution history estoppel analysis addresses the scope of the subject matter surrendered by the narrowing amendment."[2] *Festo X*, 344 F.3d at

---

[2] A "narrowing amendment" includes a voluntary amendment. *Festo X*, 344 F.3d at 1366 ("We next reinstate our holding that a 'voluntary' amendment may give rise to prosecution history

1367 (citing *Pioneer*, 330 F.3d at 1356).  "At that point, *Festo VIII* imposes the presumption that

the patentee has surrendered all territory between the original claim limitation and the amended

claim limitation."  *Id.* (citing *Festo VIII*, 535 U.S. at 740).  "The patentee may rebut that

presumption of total surrender by demonstrating that it did not surrender the particular equivalent

in question according to the criteria discussed below."  *Id.*  "Finally, if the patentee fails to rebut

the *Festo* presumption, then prosecution history estoppel bars the patentee from relying on the

doctrine of equivalents for the accused element."[3]  *Id.*

### 1.   Rebuttal of the *Festo* Presumption.

The Federal Circuit has summarized the Supreme Court's criteria for a patentee to

demonstrate that it did not surrender "the particular equivalent in question":

> [A] patentee may overcome [the Festo VIII] presumption by showing
> that "***at the time of the amendment*** one skilled in the art could not
> reasonably be expected to have drafted a claim that would have literally
> encompassed the alleged equivalent."   Specifically, the [Supreme]
> Court enumerated the three ways in which the patentee may overcome
> the presumption—*i.e.*, by demonstrating that "the equivalent [would]
> have been unforeseeable at the time of the [amendment]," that "the
> rationale underlying the amendment [bore] no more than a tangential
> relation to the equivalent in question," or that "there [was] some other
> reason suggesting that the patentee could not reasonably be expected to
> have described the insubstantial substitute in question."

*Festo X*, 344 F.3d at 1365 (citations omitted) (emphasis added).

---

estoppel."); *see also Festo VI*, 234 F.3d at 568 ("[A] voluntary amendment that narrows the
scope of a claim for a reason related to the statutory requirements for a patent will give rise to
prosecution history estoppel as to the amended claim element.").   "[A] narrowing amendment
made to comply with any provision of the Patent Act, including § 112, may invoke an estoppel."
*Festo X*, 344 F.3d at 1366.

[3] "Both voluntary amendments and amendments required by the Patent Office signal to the
public that subject matter has been surrendered.  There is no reason why prosecution history
estoppel should arise if the Patent Office rejects a claim because it believes the claim to be
unpatentable, but not arise if the applicant amends a claim because he believes the claim to be
unpatentable."  *Festo VI*, 234 F.3d at 568.

### a. "Unforeseeable."

"This criterion presents an objective inquiry, asking whether the alleged equivalent would have been unforeseeable to one of ordinary skill in the art at the time of the amendment." *Festo X*, 344 F.3d at 1369.  "[I]f the alleged equivalent were known in the prior art in the field of the invention, it certainly should have been foreseeable at the time of the amendment."  *Id.* (citing *Pioneer*, 330 F.3d at 1357).

### b. The "Tangential" Criterion.

"[T]his criterion asks whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent."  *Festo X*, 344 F.3d at 1369.  "[M]uch like the inquiry into whether a patentee can rebut the *Warner-Jenkinson* presumption that a narrowing amendment was made for a reason of patentability, the inquiry into whether a patentee can rebut the *Festo* presumption under the 'tangential' criterion focuses on the patentee's objectively apparent reason for the narrowing amendment."  *Id.*  More specifically, the Federal Circuit has explained:

> As we have held in the *Warner–Jenkinson* context, that reason should be discernible from the prosecution history record, if the public notice function of a patent and its prosecution history is to have significance.  *See* [*Pioneer*, 330 F.3d] at 1356 ("Only the public record of the patent prosecution, the prosecution history, can be a basis for [the reason for the amendment to the claim]. Otherwise, the public notice function of the patent record would be undermined."); *Festo VI*, 234 F.3d at 586 ("In order to give due deference to public notice considerations under the *Warner–Jenkinson* framework, a patent holder seeking to establish the reason for an amendment must base his arguments solely upon the public record of the patent's prosecution, *i.e.,* the patent's prosecution history.  To hold otherwise—that is, to allow a patent holder to rely on evidence not in the public record to establish a reason for an amendment—would undermine the public notice function of the patent record.").  Moreover, whether an amendment was merely tangential to an alleged equivalent necessarily requires focus on the context in which the amendment was made; hence the resort to the prosecution history.  Thus, whether the patentee has

> established a merely tangential reason for a narrowing amendment
> is for the court to determine from the prosecution history record
> without the introduction of additional evidence, except, when
> necessary, testimony from those skilled in the art as to the
> interpretation of that record.

*Id.* at 1369-70.

### c.      "Some Other Reason."

"The third criterion requires a patentee to establish 'some other reason suggesting that the

patentee could not reasonably be expected to have described the insubstantial substitute in

question.'" *Festo X*, 344 F.3d at 1370.  "[A] patentee may not rely on the third rebuttal criterion

if the alleged equivalent is in the prior art, for then 'there can be no other reason the patentee

could not have described the substitute in question.'" *Id.* (quoting *Pioneer*, 330 F.3d at 1357).

### 2.      Surrender of the Accused Equivalent.

"To determine whether prosecution history-estoppel applies, 'the relevant inquiry is

whether a competitor would reasonably believe that the applicant surrendered the relevant

subject matter.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965,

976 (Fed. Cir. 2018) (quoting *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1364

(Fed. Cir. 2006)).  "One of the public policy principles underlying the doctrine is that 'other

players in the marketplace are entitled to rely on the record made in the Patent Office in

determining the meaning and scope of the patent.'" *Bayer AG v. Elan Pharm. Research Corp.*,

212 F.3d 1241, 1254 (Fed. Cir. 2000) (quoting *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1208

(Fed. Cir. 1992)); *see also Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389 (Fed. Cir. 1984).

"Having prosecution history estoppel as a purely legal issue is consistent with fostering certainty

as to a patent's scope, a consideration that is important for reliance by those in the marketplace."

*Bayer*, 212 F.3d at 1254 (citing *Markman*, 517 U.S. at 391).  "Consequently, testimony as to

what a reasonable competitor would conclude from the prosecution history cannot create a

genuine issue of material fact so as to bar summary judgment." *Id.* "Such testimony is only a tool, which the judge can use at his or her discretion, to aid in the legal determination of prosecution history estoppel." *Id.*

## V. The Scope of the Original Claims.

As noted above, the "first question in a prosecution history estoppel inquiry is whether an amendment . . . has narrowed the literal scope of a claim." *Festo X*, 344 F.3d at 1366 (citing *Pioneer*, 330 F.3d at 1356). The original patent application claims must be given their "broadest reasonable interpretation": "During examination, 'claims . . . are to be given their broadest reasonable interpretation consistent with the specification, and . . . claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art.'" *In re Am. Academy of Sci. Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004) (quoting *In re Bond*, 910 F.2d 831, 833 (Fed. Cir. 1990)). The "broadest reasonable meaning" must take "into account any definitions presented in the specification," and "must be consistent with the one that those skilled in the art would reach." *Id.* (quoting *In re Bass*, 314 F.3d 575, 577 (Fed. Cir. 2002); *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999)). "Giving claims their broadest reasonable construction 'serves the public interest by reducing the possibility that claims, finally allowed, will be given broader scope than is justified.'" *Id.* (quoting *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984)); *see also In re Walter*, 698 F. App'x 1022, 1027 (Fed. Cir. 2017) ("the term's ill-defined boundaries coupled with the patentee's erratic use of the term fails to inform skilled artisans about the scope of the invention with reasonable certainty"); *In re Zletz*, 893 F.2d 319, 322 (Fed. Cir. 1989) ("When the applicant states the meaning that the claim terms are intended to have, the claims are examined with that meaning, in order to achieve a complete exploration of the applicant's invention and its relation to the prior art."); *In re Prater*, 415 F.2d 1393, 1396 (C.C.P.A. 1969) ("We are not persuaded by any sound reason why, at any time

before the patent is granted, an applicant should have limitations of the specifications read into a claim where no express statement of the limitation is included in the claim.").

<u>**ARGUMENT**</u>

**VI.     The January 2005 Amendments.**

    **A.     Lilly Narrowed the March 2004 Claims.**

The first estoppel question is whether the January 2005 amendments narrowed the literal scope of the March 2004 claims.  *See Festo X*, 344 F.3d at 1366; ¶¶ 16, 18, 19 above.

        **1.     The "Antifolate" Claims.**

There is no dispute that Lilly's patent application claims to "reducing the toxicity associated with the administration of an antifolate" encompassed administration of pemetrexed and its pharmaceutically acceptable salts, ███████████████████.  There is also no dispute that, when Lilly amended those claims to "pemetrexed disodium," Lilly narrowed the claims to administration of "the pemetrexed disodium salt."  *Hospira*, 2019 WL 3756065, at *3-4.  And, finally, there is no dispute that the Federal Circuit recently decided that Lilly overcame the presumption of surrender of the pemetrexed ditromethamine salt encompassed by those March 2004 "antifolate" claims based on Lilly's reason set forth in the January 2005 Amendment—*i.e.*, "to narrow original claim 2 to avoid Arsenyan, which only discloses treatments using methotrexate, a different antifolate."  *Id.* at *7.

        **2.     The "ALIMTA" Claims.**

The parties dispute the literal scope of the "wherein the antifolate is ALIMTA" claims. The claim term "ALIMTA" was presented to the Examiner as follows:

> 5.    (Original)  A method of reducing the toxicity associated with the ==administration of an antifolate== to a mammal comprising administering to said mammal ==an effective amount of said antifolate== in combination with a methylmalonic acid lowering agent and FBP binding agent.

> 9.    (Currently Amended)  A method of any one of ~~claims 1-6~~claims 2 or 5 ==wherein the antifolate is ALIMTA.==

SJ528-29.  The "ALIMTA" claim term must be given its "broadest reasonable interpretation consistent with the specification," including "any definitions presented in the specification." *Academy*, 367 F.3d at 1364; SJ557; *see also Zletz*, 893 F.2d at 322; *Prater*, 415 F.2d at 1396. Because the specification and literature show that the broadest reasonable interpretation of the "ALIMTA" claim term is "pemetrexed," the record proves that the January 2005 amendment narrowed the literal scope of the "ALIMTA" claims to the pemetrexed disodium salt.

### 3.    The Specification.

The specification did not define the word "ALIMTA."  SJ292-312.  But the specification described "Methods" of administering "ALIMTA" to mice and patients, and a "Method of administration and dosing procedures" for patients.  SJ301 (line 28) to SJ305 (line 11); SJ305 (line 13) to SJ308 (line 9).  A person of ordinary skill in the art would understand that those "method of administration" uses of "ALIMTA" refer to pemetrexed, particularly where the effective amount (dose) of pemetrexed is specified.  SJ1122 ¶ 12, SJ1123 ¶ 15.  In addition, a person of ordinary skill in the art would understand that the use of "ALIMTA" in the phrase "patients administered ALIMTA and folic acid as described in U.S. Patent No. 5,217,974" also refers to pemetrexed because the Lilly 974 patent claims a method of administering the GARFT "inhibitor"—*i.e.*, the antifolate pemetrexed.  SJ1122 ¶ 13, SJ1123 ¶ 15; *see also* A153 ¶ 34 (Dr. Chabner: "the claims of the '974 patent . . . recite the use of pemetrexed with folic acid").

Thus, the broadest reasonable interpretation of the "ALIMTA" claim term consistent with the method of administration and dosing procedures sections of the specification is "pemetrexed." SJ2097 ¶ 5, SJ2102 ¶¶ 12-13.

### a. Lilly's Most Preferred Example.

Lilly does not contend that the specification defines the claim term "ALIMTA."  Instead, Lilly urges the Court to interpret the claim term "ALIMTA" based on the narrowest possible readings of "(ALIMTA)" in the "most preferred" embodiment section of the specification: "Preferred examples of antifolates include . . . most preferred, Pemetrexed Disodium (ALIMTA), as manufactured by Eli Lilly & Co."  *See, e.g.*, ECF 232 at 2, 9, 14, 17, 20.  But that would be clear error.  As this Court has recognized, "although claims must be read in light of the specification, the court should not limit a claim by restricting its scope based on a preferred embodiment within the specification."  *Teva*, 2012 WL 2358102, at *2 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc)); *see also* SJ1819 ¶¶ 38-56.  Importantly, Lilly provides absolutely no authority for making an exception to this binding *Phillips* claim interpretation principle.

Equally important, Lilly's proposed "most preferred example" interpretation is unclear. If the Court interpreted the claim term "ALIMTA" to mean "[pemetrexed disodium] as manufactured by Eli Lilly & Co.," what would that phrase actually mean?  That Lilly used the claim term "ALIMTA" to limit its broadest pemetrexed application claim to particular crystalline forms "as manufactured by" Lilly?  Or to particular liquid and powder formulations "as manufactured by" Lilly?  Or to particular preclinical and clinical study products, including their labeling and dosage forms, "as manufactured by" Lilly as of June 2001?  Lilly's expert, Dr. Chabner, struggled with these ambiguities, but did not resolve them.  *See, e.g.*, A149 ¶ 25 ("ALIMTA" is a "material/product"), A152 ¶ 33 ("ALIMTA" refers to "Lilly's pemetrexed

disodium product"), A155 ¶ 36 ("'ALIMTA' is a particular formulation (Eli Lilly's formulation) of 'pemetrexed disodium'"), A167 ¶ 58 ("ALIMTA" is "a specific product from Lilly"); *see also* SJ2408, SJ2449 (Dr. Chabner relying on Lilly's 2009 and 2017 NDA product labels); SJ918; SJ1090; ¶ 25 (description of NDA products); ¶ 28; SJ205-43; SJ493-98; SJ1592-622.

Finally, Lilly's current interpretation assumes that the "most preferred" example use of "(ALIMTA)" is a "trade name" with a well-known and defined meaning. *See* ECF 232 at 2, 10. But, as detailed above, both the word and the trade name "ALIMTA" were vague and indefinite, and Lilly cites no objective evidence that a person of ordinary skill in the art understood the trade name "ALIMTA" to have a single meaning. *See* ¶¶ 12, 17, 21-25; SJ1122 ¶ 12; SJ2101 ¶ 11, SJ2105 ¶¶ 16-17. In fact, the literature proves that "ALIMTA" was used and understood to mean pemetrexed, consistent with, for example, Lilly's NDA product labels. *See, e.g.*, SJ394-400; SJ499; SJ953-54; SJ455; SJ480; SJ1124 ¶ 18; SJ2101 ¶ 11; SJ2317.

### 4. The Literature.

Because the specification did not define the word "ALIMTA," the Court may also consider the broadest reasonable interpretation of "ALIMTA" in the literature. *See* ¶¶ 16, 22; SJ559 ("Names used in trade are permissible in patent applications if: . . . In this country, their meanings are well-known and satisfactorily defined in the literature."). At the time of Lilly's application, one author had associated "ALIMTA" with both pemetrexed disodium and pemetrexed; a second author had associated "ALIMTA" with pemetrexed; and a third author had used "ALIMTA" to mean pemetrexed. SJ167; SJ196; SJ174; *see also* ¶ 21. Subsequent literature confirms that persons of ordinary skill in the art also associated "ALIMTA" with pemetrexed, and understood "ALIMTA" to mean pemetrexed. *See* ¶¶ 17, 24. Thus, consistent with the entire specification and the literature, the broadest reasonable interpretation of the "ALIMTA" claim term is "pemetrexed."

### B.      A Substantial Reason Relating to Patentability.

The second estoppel question is whether the record reveals Lilly's reason for the January 2005 amendment.  *See Festo X*, 344 F.3d at 1366.  "When the prosecution history record reveals no reason for the narrowing amendment, *Warner-Jenkinson* presumes that the patentee had a substantial reason relating to patentability."  *Id.* at 1366-67.  Here, the record shows that Lilly simply canceled the rejected "ALIMTA" claims "without prejudice," and stated that "deletion of these Claims render this objection moot."  ¶ 26.  Thus, according to *Warner-Jenkinson*, it must be presumed that Lilly had a substantial reason relating to patentability.  *Festo X*, 344 F.3d at 1366-67.

### 1.      Lilly's Argument.

Lilly appears to concede the *Warner-Jenkinson* presumption, yet Lilly argues that it could be inferred that Lilly cancelled the "ALIMTA" claims to "remove the trade name 'ALIMTA.'"  *See, e.g.*, ECF 232 at 4.  No such inference is "discernible from the prosecution history record."  *See Festo X*, 344 F.3d at 1369.  To the contrary, the actual prosecution record proves that Lilly reserved the right to pursue its "ALIMTA" claims, "without prejudice," in a later application.  *See* ¶ 26.  And, in any event, the objective evidence proves that Lilly knew "ALIMTA" was vague and indefinite, as Lilly itself associated "ALIMTA" with both pemetrexed and pemetrexed disodium, and used "ALIMTA" to mean pemetrexed.  *See, e.g.*, ¶ 4, ¶ 16, ¶ 17 (SJ342), ¶ 20, ¶ 24 (SJ718), ¶ 25, ¶ 38; SJ559; *see also* ¶ 28 (in response to EPO rejection that "ALIMTA" is "unclear," amending "ALIMTA" claims to "pemetrexed," and stating that the claims had been "***refocused*** on the use of the ***antifolate*** compound ***pemetrexed***" (emphasis added)).

### C.      The *Festo* Presumption ████████████████████████████████████.

The third estoppel question is the scope of the subject matter surrendered.  *Festo X*, 344 F.3d at 1367.  Because Lilly's January 2005 amendment narrowed the "ALIMTA" claims,

"*Festo VIII* imposes the presumption" that Lilly surrendered all territory between the original claim limitation, "wherein the antifolate is ALIMTA," and the amended claim limitation ("pemetrexed disodium").  *See id.*  Lilly concedes that, if the Court interprets "ALIMTA" to include "pemetrexed," then the administration of "ALIMTA" claims ███████████████████ ███████████████.  *See, e.g.*, ECF 232 at 4, 14, 25; A60 ¶ 89 (Dr. Chabner: "I also note that pemetrexed disodium and ████████████████████████████.  They are different salt forms of the same antifolate—pemetrexed.  Pemetrexed is the compound that exerts an 'anti'-folate effect in that it inhibits folate dependent enzymes . . . .").

### 1.     Lilly Cannot Overcome the *Festo VIII* Presumption.

As detailed above, Lilly may "overcome" the *Festo VIII* presumption "by showing that '*at the time of the amendment* one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent.'"  *Festo X*, 344 F.3d at 1365 (emphasis added).  Specifically, Lilly may overcome the presumption by arguing that: ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████.  *Id.*

### a.     ████████████████████████████████████████.

Lilly does not contend—and cannot contend—that ██████████████████

████████████████████████████████.  *See, e.g.*, ¶¶ 4, 5, 28; SJ2104 ¶ 14, SJ2106 ¶¶ 17-18; SJ1732 ¶ 15; *Festo X*, 344 F.3d at 1369.

### b.     ███████████████████████████████████████

Lilly contends that ██████████████████████████████████████████

██████████████████.  But Lilly fails to apply the binding Federal Circuit precedent on point.

As detailed above, *Festo X* emphasizes that the tangential criterion "focuses on the patentee's objectively apparent reason for the narrowing amendment." *Festo X*, 344 F.3d at 1369. Instead of identifying any such "objectively apparent reason" in its January 2005 amendment, Lilly cites Dr. Chabner's attempt to infer Lilly's reason from Dr. Chabner's misunderstanding of the Examiner's September 2004 rejections. *See, e.g.*, ECF 232 at 10 (citing Dr. Chabner's attempted inference as Lilly's "reason" for the January 2005 "ALIMTA" amendment).[4]

Lilly's attempt to rely on Dr. Chabner's inference is improper. As noted above, the January 2005 amendment proves that Lilly reserved the right, without explanation, to pursue its "ALIMTA" claims, "without prejudice," in a later application. *See* ¶ 26. Thus, according to *Festo X*, the prosecution record does not provide any "objectively apparent reason" for Lilly's January 2005 "ALIMTA" amendment.

But even if it were appropriate to ignore the actual prosecution record and attempt to draw inferences about Lilly's reasons from the Examiner's September 2004 rejections, the following "objectively apparent" facts are undisputed. *First*, Lilly presented the Examiner with "method of reducing the toxicity" claims "wherein the antifolate is ALIMTA." ¶¶ 18-19. *Second*, the Examiner—based on citation and quotation of 35 U.S.C. § 112—rejected those claims as "Vague and Indefinite Language." ¶ 20. *Third*, the Examiner stated: "Claims 9, 29, 30, and 33 . . . are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing

---

[4] Apotex has moved to strike Dr. Chabner's attempts to interpret the legal basis for the September 2004 rejections. For example, Dr. Chabner admitted he did not consider the statutory basis for the rejection (§ 112), and that he is not qualified to attempt to interpret the MPEP. *See, e.g., Apotex's Motion to Strike Dr. Chabner's Patent Prosecution and Examination Opinions* (filed August 30, 2019) ("Q: If the patent defined Alimta as pemetrexed disodium, the examiner wouldn't have rejected it, right? A: ***I'm not sure. I'm not an examiner. I don't know.***"), ("Q: So you don't understand names used in trade to be referring to what the examiner called a trade name? A: ***I really don't know. I really don't know. It's not clear to me.*** As I said, I'm not a patent attorney.") (emphasis added).

to particularly point out and distinctly claim the subject matter which the applicant regards as the invention." *Id.* *Fourth*, the patent specification did not define the claim term "ALIMTA." ¶¶ 16, 22. *Fifth*, a patent claim containing an "indefinite" claim term is invalid for indefiniteness. *See, e.g.*, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1340-41 (Fed. Cir. 2015) (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)). *Sixth*, the Examiner concluded that the "ALIMTA" claim term "not only renders a claim indefinite, but also constitutes an improper use of the trademark or trade name (MPEP § 2173.05 (u))." ¶ 20.

Although Lilly harps on the fact that the Examiner recognized the word "ALIMTA" also was a "trade name" in the literature at the time of the application, Lilly omits the critical prosecution record evidence on this point. After searching the literature, the Examiner recognized the objective truth that "ALIMTA" was associated with both pemetrexed and pemetrexed disodium. *See* ¶ 21. Thus, there should be no genuine dispute that the Examiner recognized "ALIMTA" was vague and indefinite because the literature also showed it was associated with both pemetrexed and pemetrexed disodium, and was used to mean pemetrexed.

Moreover, the Examiner cited MPEP § 2173.05 (u). ¶ 20. If it were appropriate to attempt to infer Lilly's "objectively apparent reason" for canceling the March 2004 "ALIMTA" claims from the Examiner's actual stated rejections, the MPEP section cited by the Examiner shows that Lilly knew what was required to address the Examiner's "trade name" statement. Lilly could have responded that: (A) the meaning of "ALIMTA" was "established by an accompanying definition which is sufficiently precise and definite to be made part of" the "ALIMTA" claims; or (B) in the United States, the meaning of "ALIMTA" was "well-known and satisfactorily defined in the literature." SJ313; SJ314. But the overwhelming evidence in this Apotex Case proves that Lilly could not have made either showing because "ALIMTA" was,

in fact, vague and indefinite.  *See, e.g.*, ¶¶ 1-12, 15-17, 21-25.  For example, Lilly's own NDA product label at the time associated "ALIMTA" with both pemetrexed disodium and pemetrexed, and also used "ALIMTA" to mean pemetrexed.  *See* SJ499.

### c.    No "Other Reason."

Lilly does not contend—and cannot contend—that there is some other reason that Lilly did not claim ███████████████████████████ at the time of its amendment.  *See, e.g.*, ¶¶ 4, 5, 28; SJ2104 ¶ 14, 2106 ¶¶ 17-18; SJ1732 ¶ 15; *Festo X*, 344 F.3d at 1370.

### D.    ███████████████████████████████.

Because Lilly has failed to rebut the *Festo VIII* presumption, estoppel bars Lilly from relying on the doctrine of equivalents for the accused element.  *See Festo X*, 344 F.3d at 1367.  Moreover, based on all of the publicly available evidence, a competitor would reasonably conclude that Lilly's January 2005 "ALIMTA" amendment surrendered ████████████ ████████████████████████████████████████.  *See* SJ205, SJ221 ████████████████████████████████████; SJ1730 ¶¶ 10-52; SJ1120 ¶¶ 3-21; SJ1647 ¶¶ 8-11; SJ1700 ¶¶ 21-32; SJ2088 ¶¶ 4-11, SJ2093 ¶ 15; SJ2400 ¶¶ 8-17; SJ2096 ¶¶ 4-19; SJ2344 ¶¶ 11-21; SJ2383 ¶¶ 4-9; SJ693 ("PEMETREXED DISODIUM"); SJ694 ("PEMETREXED").

## VII.   The November 2005 Amendments.

### A.    Lilly Amended the June 2001 "Tumor Growth" Claims.

#### 1.    The "Antifolate" Claims.

Lilly amended its "method of inhibiting tumor growth" claims from "antifolate" to "pemetrexed disodium" and "pemetrexed."[5]   SJ765; *see also* SJ1736 ¶¶ 29-30; SJ2405 ¶ 16.

---

[5] There is no dispute that pemetrexed is the compound that inhibits tumor growth.  *See, e.g.*, ¶¶ 6, 10, 31; A153 ¶ 34 ("the claims of the '974 patent . . . recite the use of pemetrexed").

Lilly contends that the term "pemetrexed" reflects an "inadvertent omission" or "typographical error."  A157 ¶ 39.  If Lilly were correct, then the November 2005 amendment narrowed all of the "inhibiting tumor growth" claims from "antifolate" to "pemetrexed disodium."  In any event, Lilly did not explain the reason for this narrowing amendment.  SJ763-67; ¶¶ 32-33.

### 2.      The "ALIMTA" Claims.

Lilly canceled its "method of inhibiting tumor growth" claims "wherein the antifolate is ALIMTA" without explanation.  SJ765; ¶¶ 32-33.  As noted above, according to Lilly, the amendment limited all of the claims to "pemetrexed disodium."  Thus, according to the broadest reasonable interpretation of the "ALIMTA" claim term (*see* pages 22-25), the November 2005 amendment narrowed the literal scope of the "ALIMTA" claims to the pemetrexed disodium salt.

### B.      Substantial Reasons Related to Patentability.

The November 2005 amendments do not reveal Lilly's reasons for the narrowing amendments to its "method of inhibiting tumor growth" claims.  Thus, according to *Warner-Jenkinson*, it must be presumed that Lilly had a substantial reason relating to patentability.  *See Festo X*, 344 F.3d at 1366-67; *Festo VI*, 234 F.3d at 568; ¶¶ 30-33.

### C.      The *Festo VIII* Presumption.

Because Lilly's November 2005 amendments narrowed the "method of inhibiting tumor growth" claims, *Festo VIII* imposes the presumption that Lilly surrendered all territory between the original claim limitations, "antifolate" and "wherein the antifolate is ALIMTA," and the amended claim limitations ("pemetrexed" and "pemetrexed disodium").  *See Festo X*, 344 F.3d at 1367; ¶¶ 30-34.

### D.      ███████████████████████████.

Lilly's motion for summary judgment does not address the November 2005 amendments.  *See* ECF 232.  Because Lilly has failed to rebut the *Festo VIII* presumption, prosecution history

estoppel bars Lilly from relying on the doctrine of equivalents for the accused element. *See Festo X*, 344 F.3d at 1367. Moreover, based on all of the publicly available evidence, a competitor would reasonably conclude that Lilly's November 2005 "antifolate" and "ALIMTA" amendments surrendered ███████████████████████████████████████████. *See* SJ205, SJ221 ███████████████████████████████████; SJ1730 ¶¶ 10-52; SJ1120 ¶¶ 3-21; SJ1647 ¶¶ 8-11; SJ1700 ¶¶ 21-32; SJ2088 ¶¶ 4-11, SJ2093 ¶ 15; SJ2400 ¶¶ 8-17; SJ2096 ¶¶ 4-19; SJ2344 ¶¶ 11-21; SJ2383 ¶¶ 4-9; SJ693 ("PEMETREXED DISODIUM"); SJ694 ("PEMETREXED").

## VIII.  The July 2007 Amendments.

### A.  Lilly Narrowed the June 2001 "Method of Administering" Claims.

#### 1.  The "Antifolate" Claims.

Lilly canceled its "method of administering an antifolate" claims, without explanation, and replaced them with claims narrowed to "pemetrexed disodium." ¶¶ 35-36, 40-41.

#### 2.  The "ALIMTA" Claims.

Lilly also canceled its "wherein the antifolate is ALIMTA" claims, without explanation, and replaced them with claims limited to "pemetrexed disodium." ¶¶ 35-36, 40-41. According to the broadest reasonable interpretation of the "ALIMTA" term (*see* pages 22-25), the July 2007 amendment narrowed the scope of the "ALIMTA" claims to the pemetrexed disodium salt.

### B.  Substantial Reasons Related to Patentability.

The July 2007 amendments do not reveal Lilly's reasons for the narrowing amendments to its "method of administering" claims. ¶¶ 35, 40. Thus, according to *Warner-Jenkinson*, it must be presumed that Lilly had a substantial reason relating to patentability. *See Festo X*, 344 F.3d at 1366-67; *Festo VI*, 234 F.3d at 568; ¶¶ 35-41.

###### C.      The *Festo VIII* Presumption.

Because Lilly's July 2007 amendments narrowed the "method of administering" claims,

*Festo VIII* imposes the presumption that Lilly surrendered all territory between the original

limitations, "antifolate" and "wherein the antifolate is ALIMTA," and the amended claim

limitation "pemetrexed disodium."  *See Festo X*, 344 F.3d at 1367; ¶¶ 35-42.

###### D.      ███████████████████████████████████████.

Lilly's motion for summary judgment does not address the July 2007 amendments.  *See*

ECF 232.  Because Lilly has failed to rebut the *Festo VIII* presumption, estoppel bars Lilly from

relying on the doctrine of equivalents for the accused element.  *See Festo X*, 344 F.3d at 1367.

Moreover, based on all of the publicly available evidence, a competitor would reasonably

conclude that Lilly's July 2007 "antifolate" and "ALIMTA" amendments surrendered ████

███████████████████████████████████████████████████████████.  *See*

SJ205, SJ221 ████████████████████████████████████; SJ1730 ¶¶ 10-52;

SJ1120 ¶¶ 3-21; SJ1647 ¶¶ 8-11; SJ1700 ¶¶ 21-32;  SJ2088 ¶¶ 4-11, SJ2093 ¶ 15; SJ2400

¶¶ 8-17; SJ2096 ¶¶ 4-19; SJ2345 ¶¶ 11-21; SJ2383 ¶¶ 4-9; SJ693 ("PEMETREXED

DISODIUM"); SJ694 ("PEMETREXED").

## IX.      Lilly's Statement.

Lilly's "Statement of Material Facts Not in Dispute" contains arguments and

characterizations that are immaterial, ambiguous, incomplete and inaccurate.  *See* ECF 232 at

6-10.  In response, Apotex incorporates its Statement of Material Facts (¶¶ 1-42), and its Motion

to Strike Dr. Chabner's Patent Prosecution and Examination Opinions (filed August 30, 2019).

For example, Lilly's statement of "facts" uses "Lilly's ALIMTA® Product,"[6] "ALIMTA®" (¶ 2),

---

[6] Lilly's "Alimta® (pemetrexed for injection)" products were approved for marketing in the
United States in August 2004.  *See, e.g.*, Letter from FDA to John Worzalla, Research Scientist,

"interchangeably" (¶ 14), "equated" (¶ 18), and "relationship" (¶ 19). The ambiguous use of those terms further reinforces the evidence detailed above proving that the word, trade name and claim term "ALIMTA" was vague and indefinite, as the Examiner correctly concluded.

## X.    Lilly's Additional Arguments.

### A.    "ALIMTA®."

Lilly's brief sprinkles in the registered trademark symbol, ®, as a superscript to the word "ALIMTA" without rhyme or reason. *See, e.g.*, ECF 232 at 1, 3, 6, 8, 13, 18, 25, 27, 32. Lilly's inconsistent use of that superscript symbol further reinforces that "ALIMTA" was vague and indefinite, and remains vague and indefinite. *See, e.g.*, SJ1586-91 (registered trademark records identifying "goods" as "pharmaceutical preparations for treatment of cancer"); SJ499 ("ALIMTA® pemetrexed for injection" and "ALIMTA®, pemetrexed for injection" (2004)); SJ2531 ("ALIMTA® pemetrexed for injection 100 mg and 500 mg vials * * * What is ALIMTA? ALIMTA (also known as pemetrexed) . . ." (June 2018)). For example, there is no evidence that Lilly could not have marketed a pemetrexed base product using the registered trademark "ALIMTA®." *See, e.g.*, SJ534; SJ666; SJ2344 ¶ 12; SJ2373-74.

### B.    "Alimta®."

Lilly's brief also mentions the "antifolate drugs" example of "pemetrexed disodium (Alimta®, Eli Lilly and Company, Indianapolis, Ind.)" that appears in the background section of the specification. *See* ECF 232 at 9, 17, 20. But Lilly does not argue that the "ALIMTA" claim term was, in fact, presented to the Examiner as a registered trademark, ALIMTA®, because Lilly recognizes that the MPEP distinguishes trademarks and trade names. ¶ 20; *see also* SJ2454-65 (11:18-54:12, referring to SJ2473-530).

---

U.S. Regulatory Affairs, Eli Lilly and Company (https://www.accessdata.fda.gov/drugsatfda _docs/appletter/2004/21677,21462s001ltr.pdf).

**C.      "Threw Up His Hands."**

Finally, Lilly's brief tries to engage the September 2004 Examiner (Amy Lewis) in a hypothetical debate about the interplay between the broadest reasonable interpretation of the "ALIMTA" claim term and 35 U.S.C. § 112.  *See* ECF 232 at 22.  But there is no record of any such potential debate because Lilly canceled its March 2004 claims "without prejudice."  ¶ 26; *see also, e.g.*, SJ2466 (65:12-67:9), SJ2468 (76:10-78:19), SJ2470 (84:10-85:11), SJ3471 (90:11-91:11 & 92:17-93:8), SJ2472 (99:17-100:8).  Moreover, there is no genuine dispute that the word "ALIMTA" is vague and indefinite.  *See, e.g.*, ¶¶ 22-25.

## CONCLUSION

In light of the Federal Circuit's *Hospira* decision, and consistent with the binding precedent cited above, Apotex respectfully submits that the overwhelming objective evidence in this Apotex Case proves that prosecution history estoppel bars Lilly from asserting infringement under the doctrine of equivalents, as a matter of law.

<p align="center">*       *       *</p>

Dated:  August 30, 2019                    Respectfully submitted,

<p align="right" style="width:50%; margin-left:auto;">

*Sally Franklin Zweig*
Sally Franklin Zweig
Kristopher N. Kazmierczak
Kathryn E. Cordell
KATZ KORIN CUNNINGHAM, PC
334 North Senate Avenue
Indianapolis, Indiana 46204
317-464-1100
szweig@kkclegal.com
kkaz@kkclegal.com
kcordell@kkclegal.com

William A. Rakoczy
Joseph T. Jaros
Cynthia H. Sun
Xiaomei Cai
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
</p>

6 West Hubbard Street, Suite 500
Chicago, IL 60654
312-527-2157
wrakoczy@rmmslegal.com

*Counsel for Apotex Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of August, 2019, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's ECF.  Parties may access this filing through the Court's system.

| | |
|---|---|
| Anne N. DePrez<br>BARNES & THORNBURG, LLP | anne.deprez@btlaw.com |
| David M. Krinsky<br>WILLIAMS & CONNOLLY, LLP | dkrinsky@wc.com |
| Adam L. Perlman<br>WILLIAMS & CONNOLLY, LLP | aperlman@wc.com |
| Galina I. Fomenkova<br>WILLIAMS & CONNOLLY, LLP | gfomenkova@wc.com |
| Andrew P. Lemens<br>WILLIAMS & CONNOLLY, LLP | alemens@wc.com |
| Deborah Pollack-Milgate<br>BARNES & THORNBURG, LLP | dpollackmilgate@btlaw.com |
| Dov P. Grossman<br>WILLIAMS & CONNOLLY, LLP | dgrossman@wc.com |
| Michael Xun Liu<br>WILLIAMS & CONNOLLY, LLP | mliu@wc.com |
| Benjamin Greenblum<br>WILLIAMS & CONNOLLY, LLP | bgreenblum@wc.com |
| Annie E. Showalter<br>WILLIAMS & CONNOLLY, LLP | ashowalter@wc.com |

*Sally Franklin Zweig*

Sally Franklin Zweig
Kristopher N. Kazmierczak
Kathryn E. Cordell
KATZ KORIN CUNNINGHAM, PC
334 North Senate Avenue
Indianapolis, Indiana 46204
Office: (317) 464-1100; Fax: (317) 464-1111
szweig@kkclegal.com
kkaz@kkclegal.com
kcordell@kkclegal.com